Good morning, Your Honor. May it please the Court? I'd like to use my time this morning to focus on three issues. First, the invalidity of the assignment of the contract to Entergy absent Entergy's assumption of all the responsibilities under the contract, and specifically the obligation to pay the one-time fee. Second, the trial court's legal error in failing to conduct a proper inquiry concerning the foreseeability of the cost that Entergy agreed to pay to the State of Vermont as a condition to its construction of a federally licensed spent fuel storage facility. And third, the trial court's failure to hold Entergy to its urdentive proof with regard to its soil transport and spent fuel characterization costs, and instead it's foisting upon the government that burden. Beginning first with the validity of the assignment... What happens if you win on this issue? If we win on this issue, Your Honor, the consequence is simply that the government would not be found to be in privity with Entergy, and as a consequence, Entergy's judgment, $45 million judgment, would have to be reversed because of the lack of privity between the United States and Entergy. But if you prevail, the effect of that is to split the ownership of the facility and the fuel from the contract obligations, which is exactly what the standard contract seems to permit. Well, Your Honor, we are not, first of all, seeking to in any way unwind the transaction that ultimately... Well, you're saying the government can ignore it. Well, Your Honor, what we have done is to point out promptly, and when I say promptly, we pointed out in 2006, as soon as the government was informed of the nature of this arrangement, that the terms of the assignment were not permissible under the standard contract or the NWPA. Now, the NWPA contains, I'm sorry, the standard contract contains a notice provision governing what's going to happen in the event that the rights and obligations under the contract are signed. However, both Entergy and Vermont Yankee, when they purported to notify the government of the transfer of the contract, neglected to mention the $140 million elephant in the room. When did you find out about that? We didn't find out about that until 2006. Has the government since then accepted payments from Entergy? The government has accepted payments from Entergy, quarterly payments under the standard contract, and was doing so, in fact, between... Why isn't that a ratification or a waiver? You continue to accept the payments? As soon as you found out about this provision, you didn't say the assignment's ineffective. Entergy doesn't owe us any performance. It should come from Vermont. Well, first, as soon as we found out about the assignment, four years after it happened, we, in fact, did say we're not going to accept payments. We did, and we had been doing so from 2002 through 2006 under our, I think, reasonable and justified belief that all of the obligations under the contract had been transferred to Entergy. You're not really answering the question. How can the government continue to accept the payments from Energy and at the same time say that the contract is the assignment, as far as the government is concerned, is void? Because there is an existing standard contract, we recognize that the Court of Federal Claims ruled in favor of Energy with respect to this issue. There is an existing contract. There is an existing amount of spent fuel that's being generated, and by law, that spent fuel triggers an obligation to pay. Now, I understand that the consequence of our argument may be that there is no privity of contract between the United States and Energy, but the flip side of that is that, well, there must be privity between Vermont and Energy. I don't think you're answering my question. One of the acceptance of the payments from Energy, Entergy isn't a waiver, a ratification of the assignment. Your Honor, because I think we, I think the government's conduct was to accept the money with the caveat and with the reservation of the right to contest the validity of the assignment. Did you accept that? Did you say that when you accepted the payments? No, Your Honor, there was no statement to that effect, but the matter was in litigation before the Court of Federal Claims, and it was a matter for the Attorney General to be responsible for pursuant to 28 U.S.C. 516. At that point in time, when the government was notified of the terms of the assignment for the first time, it did what it could to say, wait, this is not what the contended contract provides, and the terms of the assignment were such that were inconsistent with what had previously been described to the government. I think it bears noting that when Energy in 2002, and this is on page 268 of the Joint Appendix, notified the government of the transfer, it said that please be advised that Vermont Yankee has, as of today, assigned its right title and interest to Energy. From and after today, Energy will assume and discharge the obligations of Vermont Yankee under the contract in lieu of Vermont Yankee. That was the understanding that the government had from 2002 to 2006, and that was, upon learning that, that's when the government acted to contest the validity of the assignment. Now, this is a problem, I think, entirely of Energy's making, and since 2006, for the last six years, Energy very well could have fixed the problem and said we will assume the liability to pay the one-time fee, but it has neglected to do so, it has chosen not to do so, and I can only presume that the reason it has chosen not to do so is that it's not sure that when the time comes for actual payment that Vermont Yankee is going to pay the full amount, as distinct from some smaller amount, and the fact that we're in court at this point in time contesting what Vermont Yankee owns versus what Energy owns, I think probably is a good reason for Energy to not be clear that that money will be paid by Vermont Yankee. You mean that it may be concerned that Vermont Yankee will not be good for the payment or will not make the payment, will elect not to make the payment, or that the payment will be reduced in amount by the government? I'm not suggesting that they won't pay what they perceive to be due, but I am suggesting that there is a substantial question before this court today as to how much Vermont Yankee is going to say is due, and Energy's approach to this was to... You mean because of their argument as to the set-off, or the scope of the set-off, or because that they have an argument with respect to the amount of the actual payment? Because of the scope of the set-off, Your Honor. All right, but that's before us for a resolution today, so presumably that will be settled one way or another. Presumably, Your Honor, but I think it's important to note that the validity of the assignment has to be measured not as of today, but as of the time that the assignment was made, and the risks to the United States as of the time of the assignment were probably far greater than they are today, but that's the point in time. Getting at the risk is what I'm a little unclear on, is why is the government at risk if the fee... The fee is... Payment of the fee is a prerequisite for collection of the spent fuel, as I understand it, correct? Correct. So, no pay, no collect. Why... Isn't that the perfectly solid basis on which you can expect to be paid? I don't think so, Your Honor. If you're not paid, you don't perform. I don't think so for several reasons, and Section 317, 18, and 19 of the restatement speak to the time, or speak to the factors that are to be considered when ascertaining the risk of the transfer of obligations to a third party, and one of the things they talk about in each of those provisions is the public policy component, and I know that Entergy suggests that, well, public policy doesn't trump the contract or the statute, but the validity of the assignment is to be measured vis-a-vis the public policy implications of that assignment, and in the event that there is a refusal by one party to pay the amount due, the consequence of that is twofold. First, it may well be that Entergy sues us for additional costs because of the additional length of time that spent fuel has to sit out on a pad somewhere, and second, it is also possible that, as a consequence of this, the spent fuel doesn't actually get transferred to wherever the federal repository may be, and there is a public interest that the government has been charged with under the NWPA to pick up that fuel promptly, and in the event that there is an ongoing dispute either with this party, Vermont Yankee, or with some third party that Vermont Yankee may ultimately assign the obligation to pay, the consequence of it is that that fuel sits out even longer, and this is ultra-hazardous waste, this is the most dangerous substance known to man, and it is in the United States' interest and the public policy interest to have that fuel transferred as soon as possible. And that's the nature of the risk, and that's set forth not only in section 317 of the restatement, but as well as 318 and 319, which govern the transfer of duties and obligations under a contract. I want to move, if I can, to the issue of the trial court's legal error and failure to ascertaining the foreseeability of the licensing costs that Entergy incurred. Let me ask you a question about that. I understand your argument about the Clean Energy Fund and some other aspects of this, but the one thing that troubles me a little bit is the legal and lobbying costs. I mean, it does seem to have been foreseeable in 1983 that there might be some legislative approval required for constructing the dry storage facility. So why shouldn't the government have anticipated that there could be at least some measure of legal and lobbying costs required to secure that approval? Your Honor, this is, first of all, not an issue that the trial court independently considered. Most of the analysis was with regard to the entirety of the $9 million. With regard to the lobbying costs, there was a change in the law. And as I understand it, the lobbying costs were largely spent negotiating the memorandum of understanding with the Department of Public Service of the State of Vermont pursuant to that change in the law. And it's the unforeseeability of that change in the law and the need to engage in this extensive and very lengthy negotiation process. But that seems to be a challenge to the saying that the amount wasn't foreseeable. But certainly some portion of it was foreseeable in the sense that you might have to get a bill through to get the approval or there might be action to require additional approvals. It wasn't at least that foreseeable. I mean, what might be called the blackmail aspect of it perhaps wasn't foreseeable. We'll get into that. But some action by the legislature to require approval and some legal and lobbying costs seem to have been a possibility in 83, no? Well, I think that the inquiry has to be whether or not each of the circumstances that led to this particular type of loss were foreseeable. And as we explain in our brief, the statutory scheme as it existed in 1983 was, and as NV even understood it as of the time of the purchase of the plant, was that no legislative approval whatsoever would be required in order to build a spent fuel storage facility. That might have been the state of the law, but there was, you're relying on a specific legislative exemption. The fact that the legislature had gone so far as to create an exemption suggests that there might be further legislative action in the future relating to the exemption. Well, certainly that's conceivable, Your Honor. But there is a distinction to be drawn between that which is conceivable and that which is foreseeable. And this is quoting Section 351, foreseeable as a probable result of the breach. And certainly it's conceivable that the legislature might change its laws or something like that. But that's a circumstance that's far more akin to Old Stone than it is to Anchor or Citizens Federal. Let me ask a variant on Judge Dyke's question. Suppose that Entergy, instead of entering into the memorandum of understanding, had fought Vermont tooth and nail in litigation and had ultimately prevailed. Do you think the litigation costs would have been recoverable? I think that some of them may well have been, Your Honor. And I think it's probably correct to say that, well, it is correct to say that there are costs that the government does not challenge in these cases in terms of obtaining a license in the regular course of a business. So even though you say that Vermont's changing its position was not foreseeable, you nonetheless think that given that the position changed and there were substantial litigation costs, that those litigation costs might be recoverable, would be recoverable? I think that depending on the amount of them and what exactly they were for, that they may well be recoverable. And there are certain costs in all of these spent fuel cases incurred in order to pursue a license either for the NRC or various state proceedings. And that includes challenges that third parties may bring to the pursuit of a license. For example, you can contest the application for a spent fuel storage facility before the NRC, and there's third party litigation associated with that. And we don't necessarily challenge that. I see I'm into my reserve. You are. Would you like to take it? I will. Thank you. Pardon? No. Let's see. We have two arguing for the appellees here. Mr. Pack? We had thought that Vermont would go first, but I'm happy to go. Well, your choice. If Vermont would like to go first, then we'll hear from Vermont. Or Mr. Conway. All right. Mr. Conway, why don't we hear from you then? I'm glad to go. Chairman, do you prefer to go first? Go ahead. Good morning, Your Honor. As the mayor pleads to court, I'll reserve one minute of my seven minutes for rebuttal. The only issue in our case has to do whether Vermont, Yankee Nuclear Power Corp., reserved any rights to sue for any damages under the standard contract. As I think you know from the briefs, we signed the standard agreement on June 10, 1983. We sold the power plant to Entergy on June 2, 2002, four years after the government defaulted on the standard contract. In the purchase and sale agreement, we retained the obligation to pay the one-time fee, which is now in excess of $140 million. So even though we sold the power plant, we retained that obligation under Section 6.11. And we retained as a reciprocal right the ability to sue the government for any defaults related to that one-time fee for fuel used to burn fuel electricity before 1983. So it's a reciprocal obligation, a narrow obligation to pay, a narrow right to sue. Well, what you're contending is that the pre-transfer damages in their entirety remain with Vermont, right? Not necessarily in their entirety, Your Honor. Only with respect to fuel, to obligations for the fee for fuel before 1983. I don't understand what you're saying then. Well, we say in the agreement that we agreed to pay all fees for electricity generated at BNYNPC prior to closing. And we said in Section 2.1N that we reserve the right to sue for damages for relating to the one-time fee for fuel burned before April 7, 1983. That's all we're saying. We're not saying that we have every right pre-closing. We say we have a narrow right for costs accrued as of closing to burn fuel for electricity generated before 1983 because that's what the one-time fee is for. So it's a very reciprocal right. How is that different from what I've said? Well, what you're saying is it could be any pre-closing cost. It could be a reacting fee. Oh, you mean it has to relate to the fuel that was consumed before the transfer? It has to relate to the fee for the fuel burned before the transfer, yes. In other words, give me an example of the kind of expense that you say that you ought to be able to sue to recover from that. Well, suppose there are re-racking fees that have to be incurred because you can't move fuel out of the spent fuel because it has all the fuel burned since the day the plan started. The re-racking fee is for fuel burned before 1983. Those would be claims we would have. And what provision of the contract says that you have those claims? 2.1N, 2.2I, 611B. Well, what's the language that gives you that? The language. Under 2.1N, it says, subject to 611B, any claims of VYNPC related to DOE's defaults under the DOE standard contract accrued as of the closing, which was in 2002, whether relating to periods prior to or following the closing, those were sold, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983. So we don't claim that we retain all pre-closing costs. We claim only a narrow segment of that. So that's what we say we have. And then in 2.2I, it is repeated again. The parties repeated again that Vermont Yankee retains all claims to the extent applicable to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983. And then in 611B, we have the obligation to pay the one-time fee, which is now over $140 million, subject to any rights of set-off to which the seller, which is Vermont Yankee, may be entitled by reason of the Department of Energy's defaults to the extent standard contract. I think it's a very clear reciprocal right. We retain the right to pay. We retain the obligation, the ability to sue for those damages relating to the fee for fuel. It's a reciprocal right. The real question is, what is relating to the one-time fee? Does that mean any damages relating to the fuel or relating specifically to the fee set-offs? I think it's both. Go ahead. When you look at the language of the exclusion under 2.1N, it says, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7. I think it's both. Well, but it doesn't say and with respect to the fuel. It says the one-time fee with respect to the fuel. That is the fee with respect to the fuel. That is correct. Your argument would be much stronger if the words, with respect to the, or the words, the one-time fee were not in the text, correct? I think what the parties are trying to do here is to say that Vermont Yankee retained the obligation to pay the one-time fee, which was for fuel burned before 1983. And they retained the ability to sue for damages relating to the fee for the fuel burned before 1983. It's a perfect reciprocal right. That's what we're saying, so... But not very clearly expressed. Well, I didn't write it, so... But it's a difficult concept to put into words, but the parties said it three times. This wasn't some errata that found its way into this purchase and sale agreement. It's stated in three different sections. No, it's clear that the parties intended to deal with the issue. The problem is, it isn't entirely clear how they did it. As they say, it is not a model of clarity. But nevertheless, when you look at the bedrock for spent nuclear fuel cases under Indiana-Michigan out of the D.C. Circuit in 1996, and out of the Yankee Atomic case out of this circuit in 2008, the bedrock of the cases is a reciprocal obligation of the parties. We have a right to, as Judge Rison, as you said earlier, you have the ability to sue for damages, and you have the obligation to pay for fuel. That's all I'm talking about here. Okay, you're into your rebuttal time. I'll save my one minute, Your Honor. Well, we'll give you an extra minute. I guess we've chewed up your full time. Thank you. We'll hear now from Mr. Bagley. Thank you, Your Honor. Brad Bagley for the inter-G parties here. I'll address the issues that have been addressed here, and I'll start with the government and the assignment issues. I'm frankly a bit surprised to hear the emphasis from the government on the assignment issues. We think the clear language of the statute in this Court's analysis of ruling and dominion dictates the correct result of the government's argument on this aspect of the claim as well. There's only two ways by which the government can get to the position that it argues here now, both of which are impermissible constructions of the statute. It either has to read out the words rights and duty of a party. I'm not so sure that they're not right about the language of the standard contract which doesn't provide for a partial assignment and the restatement does say that there can be circumstances in which a partial assignment is not permissible. But it seems to me that even if they could have undone the assignment as far as the government was concerned in the first place, that there's been a ratification or waiver by continuing to accept payments. Well, we certainly don't disagree with that. I wouldn't think so. The ratification point as well. I would suggest that, again, the reasoning of the court in Dominion in terms of interpretation of the statute also gets you to the same result. And I think the struggle with, again, the lack of a remedy, if you will, here, is the Court of Federal Claims was empowered to decide who can pursue the claims in front of it. It's not empowered to offer opinions about rights that aren't yet due. When the one-time fee is due and owing,  the DOE won't show up if they're not paid the fee. And that's the best security there is. And so, again, the policy arguments... That may get them off the hook for having to pick up the spent nuclear fuel, but they don't want to be off that hook. This isn't as if they're simply free not to provide a service that they would be indifferent as to whether they provide it or not. They're arguing that there's a public purpose to be served by picking this up and they want to pick it up and they want to make sure that they get paid. Well, if it's such a public purpose, then not picking it up because they're not getting paid money, I think there's some tension there. But more importantly... But you understand the point. They're in a different position from somebody who's being asked to do laundry if they get paid and they're indifferent as to whether they'll do laundry or not. I would suggest not, Your Honor. It's every bit in Intergy's vital interest to look at what's going on in this case with the state of Vermont to get that fuel off site. And so the government's in no different position as opposed to who owes the fee. And Intergy would always have the ability to... But they have an interest in having the obligations to perform under the contract rest with a single party, don't they? They certainly may prefer that. They say they now prefer it. I don't see that there's any advantage to the government. Again, it doesn't affect the way the government is operating. It would not affect the way they perform. If they start to plan to come to the Vermont Yankee plant, they will get the trucks ready and say, we need the one-time fee. And they'll either be paid the fee or not paid the fee, but that doesn't matter. That risk is the same for whoever owns that obligation, and they'll perform. So I... Like in Dominion, the government said they would prefer to deal with one party, but that's not what the language... But you can imagine quite a mess here if this obligation to pay the one-time fee weren't supported by an escrow account, and Vermont were insolvent. There's no requirement for an escrow account if Intergy had never... No, I understand. But it does seem to me that some of the policies behind the Assignment of Contracts Act are implicated here. I would respectfully disagree in the sense of the practical realities of this DOE program. And again, moreover, as this court said again in Dominion, the policy arguments can't trump the statute in the contract. I would like to move, if I can, in the short time I have available, to the Certificate of Public Good call. Now, what about these payments into the Clean Energy Act? And let's suppose we reject your argument about the type of mitigation costs not having to be foreseeable. What in 1983 would have led anyone in this business to think that the states would demand payments of the sort that Vermont demanded here as a condition of the approval? Has that ever happened before? Well, first of all, it's not the law that the type of payment has to be foreseeable. I ask you to assume that it is. If you assume, contrary to law, that the type of payment has to be foreseeable, in 1983, the state of California was attempting to impose restrictions on the building of nuclear power plants. That wasn't my question. My question is, was there any state in 1983 that had demanded payments of the sort that are involved here? There was no dry storage in 1983. There was no what? No dry storage in 1983. So no. The answer is no. There was no occasion for any state to ever impose that type of fee because in 1983 Or fees for licensing plants. Oh no. There are all kinds of fees that states charge to licensing plants. Environmental fees, water disposal fees, taxes. There's all kinds of fees. Were there any fees similar to these fees requiring payment into a clean energy fund as a condition for licensing a plant in 1983? There were all kinds of fees extracted by states. It was well known that many states were hostile to nuclear power, including all the activities. You're not answering my question. I'm trying to. There's no clean energy fund that existed in 1983. There was no similar payment required for licensing the plants in 1983. There was no payment like the clean energy fund, called a clean energy fund imposed by states. What there was Let's suppose that Vermont here said, in order to license the dry storage facility, you got to pay $100 million into our schools fund to support state schools. Would that be permissible? It would be foreseeable but not necessarily recoverable. If I could elaborate on that for a moment because what is foreseeable is that states, including the state of Vermont, who had a statute on the books prohibiting dry storage, by the way, and we talked a little bit about that, there was an exception, but nevertheless the statute on the books prohibiting dry storage, but states were hostile, some states, to nuclear power, and states would use all the tools at their disposal and maybe some tools not at their disposal to inhibit the development and operation of nuclear power. So, in your hypothetical $100 million for schools, yes, foreseeable. Now, would that be recoverable? I suggest potentially not because then the question becomes the reasonableness of the mitigation and that's a fact situation very, very different from here where, and testimony taken by the record, it's important to emphasize, clear error standard, foreseeability is a question of fact, exhaustively reviewed by the trial court. Here, in this case, Would the $100 million payment into the schools fund be preempted? Potentially, and I don't know. This particular, there's never been a ruling on that in a particular, this clean energy fund, the real one that happened in this case. There's never been a ruling about whether that's preempted or not. Suppose we conclude that it would be preempted. How can you recover it? It's still foreseeable and it's still... Wait. It's foreseeable that you'd have to make a payment that was unlawful? Absolutely. That's what's going on in Pacific Gas and that's what's continued to go on. States, again, approach the line and sometimes cross the line. So the foreseeability question, which is, I understand Your Honor's question is the precise one being asked. Yes, foreseeable, but I want to be clear. I'm not necessarily saying it's recoverable because then you have to do the calculus of whether it's reasonable mitigation. So in the $100 million example, I could foresee that could change the calculus. Because of the amount? And all of the other factors being determined and reviewed by the trial court here. Again, the relationship with the state, the desire to continue operating the plant. The two points I wanted to emphasize with respect to this... So the state, in essence, can require a blackmail payment for the approval. You don't have to challenge it and you can recover. No, I'm not saying that. No, I'm not. And I apologize because I'm not being clear. What I'm saying is the state can blackmail and maybe or maybe not that's permissible. If it's not and if the amount is enough that it causes the reasonable mitigation step to be to take them to court and get it overturned for preemption, then that's the step that the utility would have to take. So what I gather you're saying is that if the state's conduct is plainly unreasonable, then your mitigation of paying a plainly unreasonable extraction would be itself unreasonable. You should have fought them in court. It's a fact-driven inquiry. I think that's right, Your Honor. It's a fact-driven inquiry and again, in the fact-driven inquiry presented in this case, the trial judge did not clearly err with respect to the facts here. And I want to be crystal clear. I'm not saying this Clean Energy Fund is or is not preempted. It's never been decided. We're arguing in the Vermont District Court still that aspects of this statute are preempted, right? Very narrow pieces of it, yes. And again, a very different lawsuit in terms of what's going on in the Vermont District Court. It involves Operation the Plant 2012. And I think that emphasizes one key point I want to make. With the government's plethora of filings about judicial notice and all the filings in that district court action, what the government is saying is, you should have done X instead of Y. And that is the classic, as the trial judge here said, at its essence, an attack on mitigation. And there are very high standards articulated by this court in terms of overturning or second-guessing a non-breaching party's choice of mitigation measures. And that's really what's at issue here. Recognizing I submit those high standards, the government tries to cast it as an issue of foreseeability, but for the reasons I've tried to explain, it was foreseeable that states would do, some states would do, anything and everything, and including crossing the line. Why was it foreseeable that they would require payments in the Clean Energy Fund when you've agreed that there wasn't anything like that in 1988? Again, I apologize, I'm not being clear. It was foreseeable that they would take whatever steps they had available to them and including potentially some steps that were not to inhibit storage. And payment of fees, I think, falls comfortably within that zone of steps they might take. Now, if the law... Wait, you're saying that it was foreseeable that the states would take steps to inhibit storage? Or, yeah, to inhibit the storage. Why didn't they like storage? Because that's a way to shut the plant down. Because of safety concerns? Well, potentially, yeah. That's articulated and that gets into the question of whether it's preempted. Again, I want to be clear. I'm not saying it is or is not preempted. It may well have been preempted, but that's not... To the extent it was foreseeable that the state would have safety concerns, it was foreseeable that those concerns would lead to a preemption of the state legislation, right? I'm sorry, I... To the extent that it was foreseeable that the state would do things because of safety concerns, it was also quite foreseeable that any action taken because of safety concerns would be preempted. Might be subject to a preemption challenge. It was going on, like I said, so the notion, and I think the point I'm trying to make is... But not just a challenge, that they would be preempted. Well, we don't know that until we litigate it. In the district court proceedings in Vermont, there have been multiple live hearings testimony by senators. There has to be a preempted purpose and a preempted effect. And, again, that's... If you look at the docket sheet of that district court action in Vermont, it's as long as your arm in terms of what's been going on there. But the core question, I think, candidly, the government has made our case for us by citing these preemption cases. You can't just say because it's preempted or arguably preempted, it's necessarily unforeseeable. The states were crossing that line in 83. They continue to try to cross that line. They crossed it in 2004 on the Skull Valley case the government cites and relies upon. You can't say that because it is arguably preempted and it's not foreseeable. I would respectfully submit. I'd like to brief if I have any time left here. Well, I didn't have a chance to respond with respect to... Just very briefly, we would emphasize what the actual language of the purchase and sale agreement says. It says, relate to the one time fee. What's a set-off that relates to the one time fee? Give me an example. Let's say that some other court, this court or the D.C. Circuit or somewhere says the government's 20 years late, we're going to cut the one time fee in half. Well, that's not a set-off. That's just tells us what the fee is. What's a set-off that they could exercise as a claim against an assertion by the government that they owe $140 million? Well, it would have to be something again, and it's important to put the timeline in place here. When this PSA was executed, it was before this court's ruling in Indiana, Michigan when we knew that there was going to be incremental, not future damages. And it's also before the 11th Circuit Alabama power decision had determined that the Nuclear Waste Fund was not an appropriate place to go. And so, the notion that you might be able to set off any fees with respect to damages was still not as clear as it is today. But to go back to your Honor's question, I'm not sure that clearly, I know what it was not. It was not dry storage. The problem is if we don't, if we really can't identify anything that qualifies as a set-off, Well, I would not Your first example didn't leave me with a confident feeling that that constitutes a set-off. So, if there's no such thing as a set-off to the fee, then that makes more plausible the argument that the set-off must have referred to something broader. Well, at the time again, when the parties were looking forward when they signed the PSA and Vermont Yankee was on the hook for the one-time fee, again, not knowing how, whether set-offs would play out or what would happen, if there was ever going to be a reduction of that fee, again, and I recognize and understand, Your Honor, is not wowed by my example here, but I would quibble with that a bit and say that that is a set-off when you talk about a reduction or you talk about a forgiveness, and so that makes sense. Thank you. We will save you a minute if there is any point on which we We had a cross-appeal and I don't know if we need a whole minute or not. Nobody seems to have mentioned it so far and so if we have no further mention, then that will be it. All right. We will hear rebuttal from the government. Thank you, Your Honor. I would like to make four points in the order in which they came up. First, counsel for Entergy brought up the Dominion case. As we described in our brief, claims are different than obligations and the restatement and provisions of the restatement treat them very differently. The counsel suggested that public policy doesn't trump the statute, but public policy is an issue to be analyzed in considering whether an assignment is valid and just because the NWPA or the contract says that the obligations may be assignable, it doesn't say that they can be assigned in all circumstances. Therefore, the court needs to look and the trial court should have looked at these public policy questions, at these questions about the risk to the United States. It's not a question of public policy being irrelevant. To the contrary, the restatement makes clear that the public policy implications are part and parcel of the analysis of whether the Secondly, counsel suggested that as of 1983 there was no such thing as dry storage. That's not correct. As we cite on page 37 of our reply brief, back in 1980, the NRC promulgated regulations describing how it was that utilities could seek a license for an independent spent fuel storage installation. Thirdly, there was a question here from Judge Dyke concerning $100 million for schools or something like that. I think one of the points that didn't get addressed there that needs to be addressed is that there's a serious intervening causation problem. And I recognize that in Old Stone the court properly indicated that the questions of causation and foreseeability in this context are not necessarily distinct. But in the event that the state of Vermont said, well we'd like you to pay $100 million for schools or a skyscraper or something like that, then you'd have a situation in which this is truly an intervening causation. As counsel for Vermont said, and this is on page 749 of our joint appendix, the clean energy development payments had, quote, nothing to do with dry storage. Nothing to do with dry storage. Well, if they had nothing to do with dry storage, how in the world could it possibly be conceivable to DOE that if energy needed dry storage, that energy would be on the hook for payments to the Clean Energy Development Fund. It is a question of intervening causation. And for that reason it's not a question of mitigation or the reasonableness of the mitigation. It's a question of whether or not these are causes, intervening causes, that came up that DOE should have foreseen at the time of contracting. And there's no proof in the record suggesting that in any way, shape, or form, DOE was unnoticed, that it should have known, that it did know that this was a possibility. And as the court indicated, or as Judge Dyke's question in response to Judge Dyke's question, there was no example of utility of the state reaching out to try to extort or extract or whatever you want to call it, blackmail utility into having to make payments of any kind as a condition to continue to operate or to store fuel or anything like that. Finally, and this is just set forth in the third motion for judicial notice that we filed, Energy did argue before the District Court that the entirety of Act 74, and Act 74 is the Clean Energy Development Fund, is preempted. Now, it tried to cabin in its claim perhaps because it knew that this might be an issue in this particular lawsuit. And it tried to suggest oh, we're not challenging the Clean Energy Development Fund payments. But when it didn't get the injunction that it originally wanted from the District Court, it went back to the District Court and said, and I put it in bold and in italics, we think that the entirety of Act 74 is preempted and the court's ruling in Vermont according to Energy was that the entirety of Act 74 is preempted. Very well. Thank you, Your Honor. Thank you. I did not hear anything from either party about the cross appeal, so we will have no further rebuttal. Thank you. The case is submitted. We thank all counsel.